## FRY v. NATIONAL SAVINGS & TRUST CO. et al.

(Court of Appeals of District of Columbia. Submitted October 16, 1922. Decided May 7, 1923.)

### No. 3776.

1. **Husband and wife ⬥4—Parent and child ⬥3(2)—Husband cannot claim reimbursement from wife or children for expenses of providing a home.**

    A husband and father is legally and morally bound to provide a home for his wife and minor children, and when he performs that obligation by the expenditure of personal funds, he cannot, in the absence of a valid express agreement, lay claim either at law or in equity to reimbursement from his wife or minor children.

2. **Trusts ⬥81(2)—Trust does not result in favor of husband for payment of half of purchase price of property taken in wife's name.**

    Even if a husband paid out of his own earnings half of the purchase price of property conveyed to his wife, no resulting trust or agreement to make good the outlay could be implied against his wife, and much less against his minor children.

3. **Trusts ⬥81(2)—Husband has no lien on wife's property for advances voluntarily made to secure a home.**

    When a husband and father spends his own money voluntarily to secure a home for his wife and minor children, or incurs an indebtedness in that behalf, the property of his wife is subjected thereby to no lien or resulting trust in his favor.

4. **Wills ⬥5—Lien for advances cannot be converted into title which may be devised without further proceedings.**

    Even if a husband had acquired a lien on his wife's property for advances made by him for improvements thereon, that lien could not be converted into a title which he was authorized to devise without further proceedings.

5. **Wills ⬥6—Life tenant under will held to have acquired only life estate in property received in exchange.**

    Where a will devised property to a husband for his life, with remainder to the children, and empowered the husband to sell or exchange the property and hold the proceeds as the original estate was held, the husband, who expended funds of his own in the improvement of the property, and thereafter exchanged it for other property conveyed to him in full, and which he likewise improved, acquired only a life interest in the property received in exchange, and therefore could not devise that property.

Appeal from Supreme Court of the District of Columbia.

Suit by the National Savings & Trust Company, as administrator with the will annexed of the estate of Henry D. Fry, deceased, against Annabel Lee Fry, Gertrude C. Duvall, and another, for instructions as to the performance of the administrator's duties. From a decree adjudging that Gertrude C. Duvall and another were the owners in fee of the property devised by the will, Annabel Lee Fry appeals. Affirmed.

George P. Hoover and John R. Shields, both of Washington, D. C., for appellant.

William G. Johnson and W. C. Sullivan, both of Washington, D. C., for appellees.

Before SMYTH, Chief Justice, ROBB, Associate Justice, and SMITH, Judge of the United States Court of Customs Appeals.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

SMITH, Acting Associate Justice.   Dr. Henry D. Fry married Gertrude May Campbell in 1884.   At the time of the marriage Mrs. Fry owned a house on L street and District of Columbia 3.65 bonds of the value of $8,000.   The record does not disclose that Dr. Fry owned any real property at the time of the marriage, or that he acquired any until after the death of his wife on the 7th of October, 1891.

On the 27th of June, 1885, about one year after the marriage, Mrs. Fry purchased the property known as 1133 Fourteenth street, and the same was conveyed to her in fee simple for and in the consideration of the payment by her to the grantor of the sum of $7,000.   During the summer of 1885 Dr. and Mrs. Fry, their young daughter Gertrude, born on the 25th of May, 1885, and Dr. Fry's mother, moved into the frame house on the Fourteenth street property, and the home of the family and the office of Dr. Fry was there established.   Edith Fry, the second daughter of Dr. Fry, was born in the Fourteenth street house on March 20, 1887.

Mrs. Fry, on June 18, 1891, executed her last will and testament, which contained the following provisions disposing of all her property, to wit:

Item One. I desire all my just debts be paid by my executor to be hereinafter named.

Item Two. I give, devise and bequeath to my husband, Henry D. Fry, all my estate, real, personal and mixed, and wherever situated for life, remainder to my children absolutely; and I hereby authorize and empower my said husband to lease, encumber or sell all or any part of my estate as absolutely as if the same were his own, the proceeds to be reinvested in real estate in this city in his discretion and held as the original estate was.

Item Three. Should I own my house on L street in square 620 in this city, at the time of my death, it is my wish that the same or the proceeds thereof if sold as provided for in the foregoing paragraph shall belong to my husband until my children attain the age of twenty-one years, at which time it shall become theirs absolutely and equally.

Item Four. I appoint my husband executor of this my will and testament and request that he be not required to give bond.

Mrs. Fry died on the 7th of October, 1891, and her will was admitted to probate and letters testamentary granted to Dr. Fry on the 18th of December, 1891.

After that will was made, and on the 19th of June, 1891, a loan of $7,000 was obtained from the banking house of Riggs & Co., in consideration of which loan Dr. and Mrs. Fry executed a joint and several promissory note, and, as security for the payment thereof, a deed of trust conveying the Fourteenth street property to Thomas Hyde and Charles C. Glover.   That deed of trust expressly provided for the reconveyance of the property to Mrs. Gertrude May Fry on payment of the note, and in default of such payment for the sale of the property, the proceeds of the sale to be applied to the payment of the debt, and the surplus, if any to be paid over to Gertrude May Fry. The deed of trust recited that the joint and several note secured thereby was for money loaned to Gertrude May Fry for the benefit of and in relation to her separate estate.   The $7,000 loaned by Riggs & Co., less a commission of $70 was credited to the account opened by Dr. Fry with the firm on the day the loan was made.

Some time in May, 1891, a contract having been entered into with John E. Simms to build a four-story and cellar brick dwelling on the Fourteenth street property, Dr. Fry and his family moved to 1129 Fourteenth street, and the frame house at 1133 Fourteenth street, belonging to Mrs. Fry was torn down to make place for the new building. The structure covered by the contract was finished in January or February, 1892, after the death of Mrs. Fry, and was occupied by Dr. Fry, his mother, and his two daughters. The first floor, with the exception of the kitchen, was used by Dr. Fry for offices, and the rest of the building as a home. In 1892 Dr. Fry married Miss Ida Lindsay, and until her death within a year after the marriage she and her mother lived in the new house on Fourteenth street.

In June, 1896, Dr. Fry paid $5,000 on account of the $7,000 loan, and the balance on November 4, 1898. On the 24th of October, 1898, Dr. Fry agreed to convey unincumbered to Charles A. Early the Fourteenth street property, and in consideration of that conveyance Early agreed to convey to Dr. Fry lot 62 in Square 111, subject to an incumbrance of $7,500, and to execute to Dr. Fry his promissory note for $8,500, secured by a deed of trust on the Fourteenth street property. On the 25th of October, 1898, the will of Gertrude May Fry was readmitted to probate under the Act of June 8, 1898, and in that proceeding a guardian ad litem was appointed for the infant daughters of Dr. Fry on November 4, 1898.

The contract of exchange was carried out, with the exception that Early did not give his note for $8,500, as stipulated, but paid to Dr. Fry $8,457.50 in cash in lieu thereof, which amount paid off the incumbrance of $7,500 on lot 62, hereinafter designated as the Q street lot or property, and left Dr. Fry with that property clear of debt and $957.50 in cash. The deed from Dr. Fry to Early, as appears from the recitals in the deed, was made in "his own right and in the exercise of the power and authority in him vested by the last will and testament of Gertrude May Fry, deceased."

Dr. Fry borrowed $20,000 on the security of the Q street lot and erected thereon a building which cost him $26,336.34. In that building, which was completed some time in the latter part of 1899, Dr. Fry established a sanitarium, an office for the transaction of his professional business, and a home for himself, his daughters, and the mother of his second wife. The loan of $20,000 was paid by Dr. Fry in July, 1916.

Dr. Fry died on the 12th of May, 1919, leaving as his only heirs at law, his widow, Annabel Lee Fry, and his two married daughters, Gertrude C. Duvall and Edith G. Pearson. Dr. Fry, by his last will and testament, sought to devise one-half of the Q street property to his third wife and the remaining half to his two daughters. The two daughters, however, claimed that by virtue of the will of their mother, Gertrude May Fry, they became on the death of their father, Dr. Fry, the owners of the Q street property, and that therefore no testamentary disposition thereof could be made by him. Whereupon by a bill in equity the National Savings & Trust Company, administrator with the will annexed of Dr. Fry's estate, brought all the parties in interest

into court, in order to have their respective rights determined and to obtain such instructions from the court as would enable the administrator with the will annexed to perform its duties in accordance with the rights of the parties.

Annabel Lee Fry, the widow, and Gertrude C. Duvall and Edith G. Pearson, the daughters of Dr. Fry, made answer to the bill, in which they set forth the rights claimed by them under the wills of Dr. Fry, deceased, and Gertrude May Fry, deceased. After trial of the issues joined the court decreed that the daughters of Dr. Fry were the owners in fee of the Q street property, and that they were entitled as such owners to the possession thereof on May 12, 1919, the date on which their father died.

From that decree Annabel Lee Fry, the widow of Dr. Fry, deceased, took this appeal, and now contends, first, that Henry D. Fry acted as the agent of his wife in the construction of the Fourteenth street building, and acquired a lien thereon to the extent of the expenditures made by him out of his own funds for the completion thereof; second, that Dr. Fry, by paying the $7,000 incumbrance on the Fourteenth street property, and by expending out of his own funds the moneys necessary for the completion of the building thereon, acquired an undivided one-half title interest therein; and, third, that the court erred in holding that the daughters of Dr. Fry, on the death of their father, became the sole owners of the Q street property, and entitled to the rents, issues, and profits thereof.

The three contentions may be reduced to the proposition that the expenditure of personal funds by Dr. Fry for the erection of a family home on the property of his wife, devised by her to him for life and to the children in fee, established between him and his wife and children a contractual relation, which, to the extent of the moneys expended, imposed on the property so improved a lien in his favor and vested in him the fee to an undivided one-half of the premises. That proposition can be sustained only on the theory that, in making the improvements on the Fourteenth street property and in the expenditure of personal funds for the completion of the structure, Dr. Fry stood in the same business relation to his wife and daughters as if they were strangers, to whom he owed no obligation either as husband or father or head of the family.

[1] We find ourselves unable to go that far. A husband and father is legally and morally bound to provide a home for his wife and his minor children, and when he complies with that obligation by the expenditure of personal funds, he cannot, in the absence of a valid express agreement, lay claim either at law or in equity to reimbursement from his wife or minor children.

[2] Even if Dr. Fry had paid out of his own earnings one-half of the purchase price of the Fourteenth street property, no resulting trust or agreement to make good the outlay could be implied against his wife, and much less against his minor children. Story's Equity, vol. 2, §§ 1202 and 1204; Johnson v. Johnson, 96 Md. 144, 147–149, 53 Atl. 792; Mutual Insurance Co. v. Deale, 18 Md. 26, 45–47, 79 Am. Dec. 673.

[3] Payments voluntarily made by a husband and father to secure a home are at best advances, and establish no relation of debtor and creditor between husband and wife and minor children. When he spends money for a home or incurs an indebtedness in that behalf, the property of his wife is subjected thereby to no lien or resulting trust in his favor, whatever may be the rights of her creditors. McCartney v. Fletcher, 11 App. D. C. 1, 14 (see, also, opinion on reargument, page 16); Braxton v. Johnston, 34 App. D. C. 386, at page 388; Mut. Ins. Co. v. Deale, 18 Md. 26, at page 45; Jackson v. Jackson, 91 U. S. 122, 23 L. Ed. 258.

The decisions just cited settle beyond the peradventure of a doubt that no resulting trust accrued to Dr. Fry on the Fourteenth street property, and it is equally certain on the principle laid down by them that the moneys paid by Dr. Fry out of his own funds created no debt on the part of his wife or children, and impressed no lien on the property.

[4] But, admitting for the moment only that the wife and minor children did become legally indebted to Dr. Fry for the moneys expended by him, and that a lien on the property of the wife or children thereby accrued to him, that lien *could not possibly be converted into a title to the property without further proceedings, and no such proceedings were had.* Moreover, Dr. Fry never claimed that either his wife or children were indebted to him for moneys spent by him as a dutiful husband and father, and if the doctor had any such claim just how he could have enforced it, 20 years after the event, by foreclosing a lien, does not appear. We must therefore conclude that Dr. Fry did not, *because of any expenditures made by him,* acquire either before or after the death of his first wife, any legal or equitable title to the Fourteenth street house and lot, or any part thereof.

Dr. Fry acquired no title of any kind to the property until Gertrude May Fry died, and the title which then came to him was vested in him, not because of anything he did, but by virtue of the will of his wife. Dr. Fry, exercising the right and authority conferred upon him by that will, conveyed the Fourteenth street property to Early, and as a consideration for that conveyance received from Early a deed which on its face conveyed to him the Q street property.

[5] If the doctor had followed the mandate of the will, he should have required the conveyance to him of nothing more than a life estate in the Q street lot and the remainder in fee to his children. The fact, however, that he did not elect to have the conveyance made in that way, clothed him with no higher or better right than he would have had, if he had strictly followed the injunctions of the will, which not only gave him the power to sell the Fourteenth street property, but definitely determined his interest in the real estate which was substituted therefor and constituted the reinvestment contemplated by the common source of title.

Under the terms of the will, therefore, Dr. Fry acquired a life estate in the Q street property, and his children the fee thereof. His interest in the Q street property was measured by that which he had in the Fourteenth street property, and the expenditures of his own

moneys, for the purpose of making a home for himself and his children on Q street, no more established a lien or a resulting trust in his favor than did similar expenditures for a similar purpose on Fourteenth street. In short, having transferred the Fourteenth street home to Early, Dr. Fry was under the moral obligation to provide a home for his minor children, and consequently any moneys expended by him in that behalf on the Q street property established no contractual relation between himself and his children, and implied no obligation on their part to make good the outlay.

That the doctor did what he did without any intention to defraud his children goes without saying. The question of title did not bother him. He apparently counted as his the increase in value given to the Fourteenth street and Q street properties by the improvements made with his moneys, and, measuring the interest of the children in the mother's estate by its money value at the time of her death, he probably felt that a devise to them in fee of one-half of the Q street property fully met the obligations imposed on him by the will of his first wife. That was quite a natural mistake for a layman to make, but the fact remains that he had only a life interest in lot 62 of block 111, failing a valid conveyance to him of the title in fee. The life estate of Dr. Fry terminated with his death, and as he had then no title to the Q street real estate, his devise to his third wife of an undivided half thereof was without effect.

To hold otherwise would simply result in defeating a testamentary disposition which the first wife had a right to make, and which in unequivocal terms declared that all real estate owned by her on the day she died and all real estate acquired through the sale thereof should absolutely become the property in fee of her children on their father's death.

The decree appealed from is affirmed, with costs.

Affirmed.